# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| KAREN TAYLOR BAGHERI, ADMINISTRATOR OF THE ESTATE OF SHAWN MATTHEW MCKEE, DECEASED, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:14CV00077 |
| v. | ) ) | **OPINION AND ORDER** |
| DWIGHT L. BAILEY, M.D., AND APPALACHIAN EMERGENCY PHYSICIANS, | ) ) ) ) | By: James P. Jones United States District Judge |
| Defendants. | ) ) | |

*Cynthia D. Kinser and Benjamin D. Byrd (Travis J. Graham on brief), Gentry Locke, Roanoke, Virginia, for Plaintiff; Jimmie C. Miller and James N.L. Humphreys, Hunter, Smith & Davis, LLP, Kingsport, Tennessee, for Defendants.*

In this medical malpractice case involving treatment and diagnosis in a hospital's emergency department, the jury returned a large verdict in favor of the deceased patient's estate. The defendant emergency room physician and his employer have moved for a new trial pursuant to Rule 59(a) of the Federal Rules of Civil Procedure. The primary grounds asserted are that members of the jury were exposed to prejudicial news reports during trial, and were advised through questioning by plaintiff's counsel that the physician's medical license had been suspended, a fact unconnected to the alleged malpractice. While the question is a

close one under the particular circumstances of the case, I find that a new trial should not be granted, based upon my opportunity to judge the ability of the jury to put aside the information in question following my curative instructions.

I.

The following facts are taken from the record of the trial and the Motion for a New Trial.

On June 7, 2013, Shawn Matthew McKee, age 31, presented to the Russell County Medical Center Emergency Department. Mr. McKee complained of chest and back pain, shortness of breath, nausea, rapid heart rate, and a fever. Mr. McKee also had an infected foot. Dwight L. Bailey, M.D., the defendant, was on duty in the emergency department and examined Mr. McKee. While it was a contested issue at trial, the jury also returned its verdict against the codefendant, Appalachian Emergency Physicians ("AEP"), implicitly finding that Dr. Bailey was its employee.

After his initial examination, Dr. Bailey ordered a number of diagnostic tests, including a D-dimer test, a venous Doppler ultrasound, and a chest X ray.

A D-dimer test may be ordered when there is a suspected clot obstructing a blood vessel. A clot may travel to a lung, which may lead to sudden death. The D-dimer test is relatively non-specific, in that not every patient with a high D-dimer score will suffer from an embolism (blood clot), but virtually every patient with an

embolism will have a high D-dimer score. Mr. McKee had a high D-dimer score. The venous Doppler ultrasound and chest X ray were normal.

Dr. Bailey then ordered a CT (computed tomography) scan to be performed; a CT scan is a preferred test for detecting pulmonary emboli. However, Mr. McKee, who weighed 460 pounds, was too large to fit in the Russell County Medical Center's CT machine, so a scan was not performed. Dr. Bailey ultimately concluded that Mr. McKee was suffering from acute bronchitis, and released Mr. McKee from his care that night. Mr. McKee seemed to be feeling better, and Dr. Bailey testified that he told him to obtain a CT scan at another hospital if his condition did not improve.

A few days later, on June 12, 2013, Mr. McKee and his wife, Jessica McKee, started the process of moving with their two young children from their home in Lebanon, Virginia, to Post Falls, Idaho, where Jessica's family lived. The family ultimately arrived in Idaho on June 16, 2013, after driving for approximately four days.

In Idaho on June 25, 2013, Mr. McKee began to suffer from shortness of breath. Paramedics eventually took him to a hospital via ambulance. Unfortunately, Mr. McKee became unresponsive around the time the ambulance arrived at the hospital, and died shortly thereafter. An autopsy revealed that Mr.

-3-

McKee died of a pulmonary artery thromboembolism (a blood clot that moved to a lung) and bilateral pulmonary infarcts (dead tissue in both lungs).

The plaintiff, Mr. McKee's mother and administrator of his estate, filed suit against the defendants on October 28, 2014.[1] The trial began on December 2, 2015, and lasted for four days. The plaintiff introduced expert medical testimony as to the standard of care and causation from three expert witnesses, Bruce D. Janiak, M.D., Sally S. Aiken, M.D., and Richard Light, M.D., as well as testimony by deposition from Paul F. Paschall, M.D., the physician who had treated Mr. McKee in Idaho before his death. The plaintiff also testified, and called Mr. McKee's widow, Jessica, and Larry F. Lynch, Ph.D., an expert economist.

Drs. Janiak and Light opined that Mr. McKee was suffering from a pulmonary embolism when he was seen by Dr. Bailey on June 7. These opinions were supported, at least in part, by the results from the autopsy, which showed that he had pulmonary infarcts. Drs. Janiak and Light each opined that this dead tissue was caused by prior pulmonary emboli. Their opinions were also supported by the D-dimer test result from June 7, along with Mr. McKee's symptoms that day that were consistent with a pulmonary embolism. Drs. Janiak and Light asserted that Dr. Bailey should have suspected that Mr. McKee had a pulmonary embolism on

---

[1] Subject-matter jurisdiction of this court is based upon diversity of citizenship and amount in controversy. *See* 28 U.S.C. § 1332. The deceased was a citizen of Idaho and Dr. Bailey and his employer, AEP, were citizens of Virginia.

-4-

June 7 based on his symptoms and the elevated D-dimer test. They further said that because of this suspicion, Dr. Bailey should have arranged a CT scan at a nearby hospital that was able to accommodate Mr. McKee's size. Drs. Janiak and Light opined that by failing to arrange such a CT scan, Dr. Bailey deviated from the accepted medical standard of care.

The plaintiff's experts agreed that the pulmonary embolism that killed Mr. McKee on June 25 was not the same embolism that he was suffering from on June 7. However, it was opined that if the pulmonary embolism had been detected on June 7, Mr. McKee could have received anti-coagulate medication that would have prevented the June 25 embolism. Drs. Janiak and Light both testified that Dr. Bailey should have administered such medication immediately after learning that the hospital's CT machine was unable to accommodate Mr. McKee.

The plaintiff's economist, Dr. Lynch, provided testimony regarding the plaintiff's damages. Specifically, he estimated Mr. McKee's earning potential and the extent to which his statutory beneficiaries would have benefitted from Mr. McKee's future earnings.

The defendants presented contrary medical testimony from Dale Sargent, M.D., Forrest L. Tucker, M.D., William Hudson, M.D., and Dr. Bailey. The defendants also introduced testimony from the decedent's mother-in-law.

-5-

Drs. Sargent and Tucker testified that Dr. Bailey complied with the standard of care and that his diagnosis of acute bronchitis on June 7 was appropriate. These opinions were supported by the fact that on June 7, Mr. McKee's symptoms had developed slowly over several days, that he was suffering from a fever, and that he had a productive cough. Drs. Sargent and Tucker reasoned that these symptoms were more consistent with an infection and bronchitis than a pulmonary embolism. Dr. Sargent also reasoned that because Mr. McKee's chest and back pain worsened with movement, the pain was not caused by a pulmonary embolism. Dr. Sargent also pointed to Mr. McKee's normal oxygen saturation as evidence that no pulmonary embolism was present on June 7. Dr. Sargent's opinion relied in part on the Wells Critera, a set of diagnostic criteria used to analyze whether an individual has a pulmonary embolism. Dr. Tucker testified that Mr. McKee's infarcts had been caused by pneumonia, and not by a pulmonary embolism.

The defendants argued that Mr. McKee was not suffering from a pulmonary embolism on June 7, and that the embolism that killed him formed as the result of his four-day car ride from Virginia to Idaho, since pulmonary embolisms can be produced by prolonged periods of immobilization.

After argument and instructions, the jury deliberated for approximately one hour[2] before returning a verdict in favor of the plaintiff and awarding $2,750,000 in compensatory damages against both defendants, to be divided among the deceased's statutory beneficiaries.[3] The defendants now ask me to reject that verdict and order a new trial. For the reasons explained below, I will deny the defendants' motion.

## II.

The grant or denial of a motion for new trial is entrusted to the sound discretion of the district court. *Cline v. Wal-Mart Stores, Inc.,* 144 F.3d 294, 305 (4th Cir. 1998). Pursuant to Federal Rule of Civil Procedure 59(a), "'it is the duty of the judge to set aside the verdict and grant a new trial, if he is of the opinion that [1] the verdict is against the clear weight of the evidence, or [2] is based upon evidence which is false, or [3] will result in a miscarriage of justice . . . .'" *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.,* 99 F.3d 587, 594 (4th Cir. 1996) (quoting *Aetna Cas. & Sur. Co. v. Yeatts,* 122 F.2d 350, 352-53 (4th Cir. 1941) (numerals added)).

---

[2] The defendants assert that the jury likely decided liability in less than half an hour, as evidenced by a written question it submitted to the court approximately thirty minutes into jury deliberations. Its note stated, "Who is going to be over children's accounts?" (ECF No. 113.)

[3] The parties agree that Virginia law limits the damages award in this case to $2,050,000. *See* Va. Code Ann. § 8.01-581.15.

-7-

When ruling on this motion, I must remember that "[t]hough a person is entitled to a fair trial, he is not entitled to a perfect one. He does not have a right to a new trial merely because harmless error may have been committed." *Mills v. Mealey*, 274 F. Supp. 4, 7 (W.D. Va. 1967); *see* Fed. R. Civ. P. 61 (providing that "the court must disregard all errors and defects that do not affect any party's substantial rights.")

The defendants have set forth various reasons why they believe a new trial should be granted. Specifically, they argue that (1) certain of the jurors' exposure to disparaging and erroneous news coverage of the case during the trial, in violation of the court's instructions, poisoned the defendants' case; (2) evidence regarding the suspension of Dr. Bailey's medical license, even though later excluded, was unfairly prejudicial; (3) the court should not have excluded testimony from Dr. Paschall as to statements by Mr. McKee's wife; (4) on the issue of respondent superior, the court erred in allowing evidence that defendant AEP was obligated by contract to provide Dr. Bailey with medical malpractice insurance; (5) Jury Instruction No. 14A, which advised that Mr. McKee did not have a duty to arrange his own CT scan, should not have been given; (6) the defendants' proposed jury instruction, again telling the jury to disregard Dr. Bailey's lack of medical license, should have been given; (7) the testimony of the plaintiff's expert economist Dr. Lynch should have been excluded; and (8) this

-8-

court was without subject-matter jurisdiction. Several of these issues were the subject of separate briefing and argument that occurred prior to trial. At oral argument on the present motion, the defendants agreed that their first two points — the media exposure and evidence relating to Dr. Bailey's medical license — serve as the primary basis for their motion. Thus, my analysis will focus on those two issues, and I will more briefly discuss the plaintiff's other arguments.

### A. Jury Exposure to Extrajudicial Communications.

Twelve jurors were empanelled to try the case. After their selection, the jurors were instructed not to read or listen to news reports of the case. (Tr. 61, Dec. 2, 2015, ECF No. 121.)

Before the beginning of the third day of trial, on Friday, December 4, counsel for the defendants informed the court that WCYB-TV, a local NBC-affiliated television station, had broadcast prejudicial information about Dr. Bailey and had published on its website the false implication that the trial involved the over-prescription of narcotic drugs. While defense counsel did not have copies of the news reports at that time, they later filed them, either later during the trial or in connection with the present motion. Defense counsel at first contended that the broadcast had been that morning, but no evidence of a broadcast on the morning of December 4 has been presented — the offending news reports appear to have been

the evening before, as confirmed by several of the jurors and later evidence submitted by the defense.

The WCYB website article, posted at 5:35 p.m. on Thursday, December 3, stated as follows:

(Headline)  Va. doctor on trial for deadly malpractice involving  drugs

By Lenny Cohen, Digital Media Manager, LCohen@wcyb.com

(Photograph of Dr. Bailey)

A civil trial has begun against a Russell County doctor accused  of malpractice.

The estate of Shawn Matthews McKee is suing Dr. Dwight Bailey and two other defendants for $3 million.

McKee died while under Bailey's care:  one of five patients over a period of six years.

Last year, the Virginia Department of Health suspended Bailey's license to practice medicine for two years, finding Bailey prescribed large amounts of opiate drugs to several patients with drug-seeking behavior.

Bailey and his co-defendants have denied any negligence in the treatment of McKee.

(ECF No. 110-1.)  Upon learning of this post from their client, defense counsel immediately contacted WCYB and the website article was revised at 9:32 p.m. that night.  The revised post removed the words "involving drugs" in the headline and removed the portions of the article about the deaths of other patients and the

-10-

grounds for Dr. Bailey's license suspension. It also stated that Dr. Bailey "will have the ability to get his license back in the future." (ECF No. 101.)

In the meantime, a WCYB on-air news reader reported on the trial on December 3 at 5:05 p.m. and again at 6:06 p.m. The broadcast account was as follows:

> A civil trial has begun against a Russell County doctor accused of malpractice. The Estate of Shawn McKee is suing Dr. Dwight Bailey and two other defendants for $3,000,000. McKee died while under Bailey's care, 1 of 5 patients over a period of 6 years. The Virginia Department of Health has suspended Bailey's medical license since last year saying Bailey prescribed large amounts of opiate drugs to several patients with drug seeking behavior. Bailey and his co-defendants have denied any negligence in the treatment of McKee.

(ECF No. 148-1.)[4] Another report was broadcast by WCYB that night at 11:01 p.m., which used the language from the revised website article. The same on-air report was broadcast that night during the 10:00 p.m. local news on WCYB's sister Fox-affiliated station, WEMT, which utilizes WCYB's local news operation. Each of the news readings lasted approximately 22 seconds. (Video, Def. Ex. 1, ECF No. 148.)

Prior to serving as an emergency department physician, Dr. Bailey had a family practice, and the news broadcasts each showed a view of Dr. Bailey's

---

[4] Counsel for the defendants obtained video recordings of the broadcasts after the trial and filed them in connection with the Motion for New Trial, along with typed transcripts of the broadcasts. The quoted broadcast was at 5:05 p.m. The 6:06 p.m. broadcast was substantially the same.

-11-

former offices, with a sign posted on the door stating "Family Health Care CLOSED until Further Notice." (*Id.*)

The unrevised internet posting allowed public comments to be posted about the story, and there were many such comments, some pointing out the error in the nature of the claim made against Dr. Bailey in the lawsuit and others either generally praising or criticizing Dr. Bailey. (ECF No. 101.)

After defense counsel had received a copy of the website posting and provided it to the court during the afternoon of December 4, I addressed the matter with the jury. With all of the jury members present in the courtroom, I inquired of them as follows:

> I have a matter that I need to bring up with you. It appears that this morning there was, there was a news article about this case on WCYB television, and for those of you who may not be in this immediate area, I don't know if it's, if everyone gets CYB, but it's, it's the television station located in Bristol, Channel Five, and it was a news article on their morning news. In addition, it was on their internet site, and they also have a Facebook site, too. And it went into the case. And I need to ask if any of you saw that, read it.

(Tr. 139-40, Dec. 4, 2015, ECF No. 125.)

Several jurors responded in the affirmative. Accordingly, I returned the jury to the jury room, and asked for each juror who had been exposed to the stories to enter the courtroom for individual questioning.

I first questioned Juror Harr, who had advised that he had been exposed to one of the television broadcasts. In response, the following exchange occurred:

-12-

MR. HARR:  I actually didn't see it.  I was in the other room, it was on TV, and it came on, and it said something to the order of Dwight Bailey.  I don't even remember what all it said.  But it was about the case.

THE COURT:  I mean, did you get anything from it?

MR. HARR:  No, sir.

THE COURT:  Anything derogatory about Dr. Bailey?

MR. HARR:  No, sir.  I didn't see, I was in the other room.  By the time I got in there it was gone on to something else.  But I did hear it.

THE COURT:  And what is your recollection of what you heard?  If you can recall.

MR. HARR: It was about the case.  I mean, Dwight Bailey, and Appalachian Physicians, or something.  That's about it.  I can't remember much about it now.

THE COURT:  Let me ask you this, Mr. Harr.  Anything that you heard affect your ability to be fair and impartial?

Mr. HARR:  No, sir, it would not.

THE COURT:  Did you reach any conclusions about the case; that is, who should prevail in the case from anything you heard?

MR. HARR:  No, sir, I did not.  I do remember there was an amount quoted there.

THE COURT:  Amount of money?

MR. HARR:  Right.

THE COURT:  You think that was the amount of money the plaintiff was seeking?

-13-

Mr. HARR: Seeking, I think. I don't know.

THE COURT: But you have no question in your mind but that that did not affect you —

MR. HARR: It does not affect me in any way.

(Tr. 141-42, Dec. 3, 2015, ECF No. 125.)

I next questioned Juror Bedwell, who said that he had been "scrolling" through Facebook on his phone when he saw a link to the website article. He clicked on the link, and concluded that "[i]t was stuff not even about this case." (*Id.* at 142-43.)

MR. BEDWELL: It was, I mean, it was the same people's name, it was just not the same reason. Like it was something about him over medicating, or something. But it wasn't even what we've been here for.

THE COURT: So, it had something about Dr. Bailey having been over medicating patients, or something like that?

MR. BEDWELL: Yeah.

THE COURT: Let me ask you this. Would that affect you, Mr. Bedwell, in your view of the case? What you saw?

MR. BEDWELL: No, sir.

THE COURT: Anything else you remember –

MR. BEDWELL: No. That was the only thing I clicked on.

THE COURT: Do you think that you would, do you believe that that would have an effect upon your ability to be fair and impartial in the case?

-14-

MR. BEDWELL: No.

(*Id.* at 143.) Juror Bedwell further stated that he had mentioned the existence of the article to other jurors, but had not discussed any specifics, including the subject of overmedication, with them.

Juror Ramey said that she had heard a small portion of a television broadcast about the case when it came on in another room. She did not hear any specifics, and said that it would not impact her ability to render a fair and impartial verdict.

Juror Kilgore advised that he was watching the news and saw a broadcast about the case. He said that the broadcast discussed an overdose. As such, he described it as "gossip" — he further said "[i]t wasn't anything we were doing here today." (*Id.* at 146.) He went on to explain that the broadcast indicated the supposed amount the plaintiff was seeking in damages. The juror stated that the broadcast would not prevent him from rendering a fair and impartial verdict.

After these jurors were questioned, the entire jury came back into the courtroom. I then asked a few additional questions, which prompted some jurors to mention that they had heard their fellow jurors discussing the existence of the news stories. After advising the jury against considering the news stories, I excused the jury again to individually question Juror Bartlett, who had heard Juror Kilgore discuss both the broadcast that he had seen and a conversation that

occurred between Juror Kilgore and his wife.  My questioning of Juror Bartlett

went as follows:

> THE COURT:  Ms. Bartlett, you indicated you heard Mr. Kilgore say that his wife heard something.  What was that?  I didn't understand that.

> MS. BARTLETT:  I heard him say that his wife said something to him about, "Oh, I figured it out," like what the case is about, and he said, he said something about, "No, you didn't.  Don't talk to me," or something.  And, what did he say, he said that the facts that she told him were not accurate anyway.

> THE COURT:  What were those facts that she told him, do you know?

> MS. BARTLETT:  That the case was about over medicating somebody, and that the amount being sued for was around $3,000,000, and he, he put that off to reporters getting everything wrong.  And I paid no attention to it.

> THE COURT:  Okay.  So, do you have any problem putting that out of your mind and not holding that against the plaintiff or the defendant?

> MS. BARTLETT:  No, not at all.

> THE COURT:  You feel like you can decide this case fairly and impartially, regardless of having heard anything?

> MS. BARTLETT:  Yes.

(*Id.* at 150-51.)

The defendants' counsel then requested a mistrial.  After hearing arguments

from counsel, I denied the motion for a mistrial because I did not believe that any

of the jurors would be unable to reach a fair and impartial verdict because of their exposure to the media reports.  When the jury returned, I advised them as follows:

> THE COURT:  All right.  Ladies and gentlemen, I'm sorry I kept you going back and forth, and we're ready to go again.  Again, nothing you saw on television has any relation to this case, and to the extent you heard or saw anything, you're to put it out of your mind.  Again, it doesn't affect this case, whatsoever, and I think you already have some idea of what the, some idea of what the issues are.

(*Id.* at 160.)

The defendants argue that the jury's exposure to the news coverage unfairly prejudiced them, and also evidenced the jury's failure to follow the court's instructions regarding outside information.

The Fourth Circuit has held that when there is reason to believe that a jury has been exposed to prejudicial publicity during the course of the trial, the trial judge should "ascertain the extent and effect of the infection, and thereafter, in its sound discretion, take appropriate measures to assure a fair trial." *Hankish,* 502 F.2d 71, 77 (4th Cir. 1974).

In *Remmer v. United States,* 347 U.S. 227 (1954), one of the most oft-cited decisions on extrajudicial communications, the Supreme Court said that private, extrajudicial communications made to jurors during trial should be deemed "presumptively prejudicial," with the burden of rebuttal resting "heavily" on the party supporting the jury's verdict.  *Id*. at 229.  After *Remmer*, the Fourth Circuit established a process for analyzing extrajudicial communications.

-17-

> The party who is attacking the verdict bears the initial burden of introducing competent evidence that the extrajudicial communications or contacts were more than innocuous interventions. If this minimal standard is satisfied, the *Remmer* [] presumption is triggered automatically. The burden then shifts to the prevailing party to prove that there exists no reasonable possibility that the jury's verdict was influenced by an improper communication.

*United States v. Cheek*, 94 F.3d 136, 141 (4th Cir. 1996) (internal quotation marks and citations omitted); *see also Haley v. Blue Ridge Transfer Co.*, 802 F.2d 1532, 1537 n.9 (4th Cir. 1986) ("Courts have generally applied the presumption of prejudice automatically after there has been an unauthorized communication to the jury. We recognize, however, that certain kinds of extrajudicial contacts may amount to nothing more than innocuous interventions that simply could not justify a presumption of prejudicial effect.") (citations omitted). Citing to *Haley*, the defendants argue that I should apply the presumption of prejudice and grant a new trial.

The Fourth Circuit has recognized five factors that are relevant to determining whether a communication was innocuous. "These factors are: (1) any private communication; (2) any private contact; (3) any tampering; (4) directly or indirectly with a juror during trial; (5) about the matter before the jury." *Cheek,* 94 F.3d at 141 (citing *Remmer*, 347 U.S. at 229). "It is these factors that establish the law about the presumption of prejudice." *Id*; *see also Barnes v. Joyner*, 751 F.3d

229, 245 (4th Cir. 2014) (repeating *Remmer* factors), *cert. denied*, 135 S. Ct. 2643 (2015).

The jurors in this case were exposed to public communications that were not directed toward them — a fact that makes this case distinguishable from *Remmer* and *Cheek,* and that negates the first three factors stated in *Cheek*. *See United States v. Lloyd*, 269 F.3d 228, 239 (3d Cir. 2001) ("[W]e tend not to apply the presumption [of prejudice] to circumstances in which the extraneous information at issue is a media report, such as a television story or newspaper article."); *Bullock v. United States,* 265 F.2d 683, 696 (6th Cir. 1959) (concluding that it was "questionable whether the rule of the *Remmer* case" applied to a television broadcast about the defendant's case and noting that "[t]he *Remmer* case presented a situation of proven tampering by private parties"); *Thompson v. Parker*, No. 5:11CV-31-R, 2012 WL 6201203, at *11 (W.D. Ky. Dec. 10, 2012) (distinguishing *Remmer* because the subject communication was not "a private communication, contact, or attempt to tamper with the jury, directly or indirectly. The alleged exposure to outside information was a public communication. . ."), *amended on other grounds*, 2013 WL 3816705 (W.D. Ky. July 22, 2013).

Thus, while it is questionable whether the *Cheek* factors support applying the presumption of prejudice in this case, I will apply that presumption out of an abundance of caution. As such, the plaintiff must establish that there is no

reasonable possibility that the verdict was affected by the communications. *Cheek*, 94 F.3d at 142.

While the news stories, particularly the unrevised ones, at worst conveyed the idea that Dr. Bailey was overprescribing narcotic drugs to his patients and had caused the deaths of several of them because of this wrongdoing, I find that the exposed jurors did not in fact draw any such conclusions. Based upon my opportunity to carefully examine the jurors and make the appropriate credibility determinations from their responses, I find that they were not affected in their ability to judge Dr. Bailey's case fairly.

In the first place, I emphasized to them the importance of truthfully relating to me their recollections of the news stories, as follows:

> THE COURT: Ladies and gentlemen, let me ask all of you. Is there anything about this news article situation, or what may have been said on the article that would make it difficult for you to be completely fair and impartial? I mean, again, it's no crime, I'm not, I'm not going to be mad at anybody at all. It's just important to all of us to know, to make sure that there's not anybody here, from what they may have heard that, that may have affected their perception of the case, or they hold it against the plaintiff, or hold it against the defendant, or make it, interfere with, you know, their ability to decide this case based solely on the evidence. And the law, again, there's no right or wrong answer to that, just a truthful answer. And again, I promise you that nothing bad is going to happen to you at all. I can make that promise, I assure you. Anybody feel that they have a problem in that regard? None of you do. Well, I'm going to let you go home in just a little bit, but I need to talk with the lawyers just one more time, okay?

(Tr. 149, Dec. 4, 2015, ECF No. 125.)

Moreover, while we now have the ability to closely examine the offending news reports, in reality they were very briefly included in the midst of much longer news broadcasts. Our common experience as television viewers supports the jurors' statements that they perceived little of the reports' actual content. Taken together, I find that the exposed jurors at most got out of these brief reports that (1) a large amount of money was being sued for and (2) the TV station mistakenly thought drugs were involved in the case against Dr. Bailey. Of course, the amount sued for, while not evidence, is not off limits in argument to the jury, *State Farm Mut. Auto. Ins. Co. v. Futrell*, 163 S.E.2d 181, 186 (Va. 1968), and skepticism about the media's accuracy is commonplace.

The totality of the circumstances thus convinces me that the jury was not prejudiced by the news reports and that the reports do not provide an adequate basis upon which to grant a new trial.

I also do not believe that the jury's exposure to the communications evidence that they willfully violated the court's instructions, thus demonstrating unfair prejudice against the defendants. No juror intentionally sought out extrinsic information about the trial. Most of them simply happened to be near a television when one of the news stories was broadcast. The only juror who took an affirmative step to view information was Juror Bedwell, who accessed an online article when it appeared on his Facebook newsfeed. Ideally, he would not have

-21-

accessed the article, but his decision to click on it evidences little more than a momentary lapse in judgment. Juror Bedwell was questioned about what he saw and how it impacted him, and his answers convinced me that he had not been prejudiced.

## B. Dr. Bailey's Medical License.

The case would be much easier if plaintiff's counsel, following the jury's possible exposure to news accounts of Dr. Bailey's license suspension had not later insisted on bringing the suspension to the jury's attention. The facts concerning this issue are as follows.

On June 19, 2014, the Virginia Board of Medicine entered an Order of Summary Suspension that suspended Dr. Bailey's medical license for conduct unrelated to Mr. McKee. Specifically, it was alleged that Dr. Bailey and his nurse practitioners overprescribed certain medications. On September 19, 2014, the Board of Medicine accepted the voluntary surrender of Dr. Bailey's medical license for a period of not less than 24 months.

Prior to trial, plaintiff's counsel agreed that they would not introduce any evidence of Dr. Bailey's license suspension or surrender at trial unless the defendants made that issue relevant. I was informed of this agreement.

During the third day of trial, following my resolution of the media issue, defendants' counsel advised the court and opposing counsel that Dr. Bailey would

be providing expert testimony that he complied with the standard of care while treating Mr. McKee. Although the plaintiff's attorney, Mr. Byrd, first objected, he then relented, noting that "[i]f that door is going to be opened, then that door can be opened."[5] (Tr. 110, Dec. 4, 2016, ECF No. 125.) Later, Mr. Byrd advised the court, "I just want to be clear if he's going to get into expert testimony, I just want to make sure that that also is the ruling, the court is going to permit expert testimony from Dr. Bailey." (*Id.* at 121.) When I questioned Mr. Byrd as to his motive or reason for obtaining such assurances, he replied, "I have nothing else to say, Your Honor, and I'm happy to sit back down and allow the evidence to resume." (*Id.* at 121-22.)

While I was obviously clueless of plaintiff's counsel's strategy (as doubtless was defense counsel), that strategy soon became clear during his cross-examination of Dr. Bailey, when, without prior notice to opposing counsel or the court, Mr. Byrd asked him about the suspension of his medical license. The exchange went as follows:

> Q  And Doctor, you mentioned that you came here to practice in Lebanon, and you've been here since?

---

[5]  The initial objection by plaintiff's counsel was based upon Va. Code Ann. § 8.01-399, the subject of which is the physician-patient evidentiary privilege, but which has been argued also limits the scope of a treating physician's testimony in medical malpractice actions. The Virginia Supreme Court has not to date so construed the statute. *See Homes v. Levine*, 639 S.E.2d 235, 241 (Va. 2007) (finding it unnecessary to reach the question) (Kinser, C.J.)

A  That's correct.

Q  But would you agree with me that you're not practicing medicine now, are you?

A  That's correct.

Q  That's because your license has been suspended, hasn't it, Doctor?

A  Not —

Ms. Miller: We object.

The Court: I'll overrule the objection.

By Mr. Byrd:

Q  You agreed to have your license suspended, didn't you, Doctor?

A  I gave up my license on — I don't know the legal term.

Q  Well, you're familiar with the legal process, though, aren't you Doctor?

A  That's correct.

Q  And Doctor, you were asked in your deposition — well, would you agree that you agreed to have your license suspended?

A  I gave up, I gave up my license for two years.

Q  Let me show you your deposition, starting at the bottom of page eight.  Do you remember when I took your deposition at the Russell County Medical Center?

A  Yes.

Q   You remember being put under oath to tell the truth, the whole truth, and nothing but the truth, so help you god?

A   Yes.

Q   You remember your lawyers were there with you?

Ms. Miller: Your Honor, I would like to make a continuing objection. We had an agreement with counsel —

The Court: Well, I'll overrule the objection.

Ms. Miller: The whole time, so I won't be objecting, I object to this whole line of questioning.

The Court:  Yes, ma'am.

By Mr. Byrd:

Q   You were asked starting at like 21, going over to the bottom, over to page nine, "Are you currently practicing medicine?" What was your response?

A   "No, sir."

Q   I said, "When did you stop?"

A   "In June of 2014."

Q   Then I asked you, "Is your license suspended?" And what did you reply?

A   "Yes, sir."

Q   And then I asked you, "And was that something that you had agreed to?" And what was your response?

A   "Yes, sir."

(Tr. 169-70, Dec. 4, 2015, ECF No. 125.)

-25-

Argument on the licensure issue thereafter occurred outside of the jury's presence. The defendants' counsel contended that the cross-examination both violated the prior agreement between the attorneys and unfairly prejudiced the jury. The plaintiff's counsel responded that Dr. Bailey's licensure status became proper when he became a standard of care expert because that status was relevant to evaluating his expert credentials. The plaintiff's counsel reasoned that because the issue had become relevant, his cross-examination did not violate the prior agreement. While I did not change my previous ruling on the issue at that time, I asked the plaintiff's counsel to submit case law that supported his position on the matter.

After recessing for the weekend, the trial resumed on Monday, December 7. The licensure issue was again debated, and plaintiff's counsel provided a memorandum in support of their argument that licensure became relevant upon Dr. Bailey's classification as an expert. After considering the matter, I reversed my original ruling and sustained the defendants' objection to the questions regarding Dr. Bailey's license. Defense counsel requested a mistrial, but I denied that motion.[6]

---

[6] There was also a substantial discussion regarding plaintiff's counsel's decision to ask Dr. Bailey about his license suspension in front of the jury without first alerting the court or the defendants' counsel. It is clear to me that Mr. Byrd should have first raised this issue outside of the jury's presence in light of the sensitive nature of the issue, the

Immediately after the jury entered the courtroom that day, I instructed them as follows:

> Before we begin today, ladies and gentlemen, I have to advise you of something. On Friday you heard in cross examination of Dr. Bailey his license as a doctor having been suspended in June of 2014 for two years. Now, his attorney objected to that, and I overruled that objection. But I made a mistake in doing that. That evidence has nothing at all to do with this case, or with the treatment of Mr. McKee by Dr. Bailey.
>
> Accordingly, I direct you that you are to completely disregard that evidence, and not consider it or even discuss it in your deliberations in this case.

(Tr. 18, Dec. 7, 2015, ECF No. 126.) I later denied the defendants' request to again advise the jury during the final jury charge not to consider the license issue.

The question I must now answer is whether the introduction of this evidence unfairly prejudiced the jury to the point of necessitating a new trial. It is correct that Dr. Bailey testified as an expert witness on the standard of care, so the plaintiff had an interest in impeaching his credentials to detract from his opinion that he had complied with the standard of care. The plaintiff has cited to a number of cases that support her position that Dr. Bailey's licensure status was relevant to assessing his medical expertise. *See, e.g., Ney v. Smith*, No. CL990462, 2000 WL 33258766, at *1 (Va. Cir. Ct. Mar. 27, 2000) (permitting a party for purpose of impeachment to elicit that an expert physician witness's license was suspended, provided that

---

prior media exposure to the jury, and the pretrial agreement with opposing counsel. Not to do so was, in my opinion, unprofessional.

-27-

opposing party may elicit that the suspension is not related to the witness's expertise).

Nonetheless, I decided that evidence of his license revocation was more unfairly prejudicial than probative. *See* Fed. R. Evid. 403. Dr. Bailey's license revocation provided minimal information about his qualifications to express a medical opinion, but informed the jury that he had faced a serious disciplinary action for conduct that was unrelated to Mr. McKee. As such, I instructed the jury to disregard that evidence.

Whether the erroneous introduction of evidence can be cured by a cautionary instruction "is normally a matter for the proper exercise of the sound discretion of the trial court. . . ." *Riddle v. Exxon Transp. Co.*, 563 F.2d 1103, 1108 (4th Cir. 1977) (internal quotation marks and citation omitted). "This is so because the trial judge can best evaluate the atmosphere of the trial and the possibility of prejudice." *Id*. at 1109. While it may not always be simple for jurors to obey curative instructions, there is an "almost invariable assumption of the law that jurors follow their instructions. . . ." *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 501 (4th Cir. 2001) (quoting *Richardson v. Marsh,* 481 U.S. 200, 206–07 (1987)).

The defendants argue that the curative instruction did not solve the problem because the jury had the opportunity to more fully consider the inadmissible evidence during the weekend break from trial. They also argue that I should have

-28-

reminded during the final jury charge to ignore the licensure issue. However, I believe my instruction to the jury given at the time sufficiently cured any prejudice. The licensure issue presented a close question; while my initial response was to allow the plaintiff's cross-examination, I later reversed that ruling after fuller deliberation. Once the issue had been sufficiently analyzed and my final ruling was made, the jury was given an unequivocal instruction to disregard the licensure evidence. No evidence shows that the jury ignored the curative instruction.[7]

This situation is somewhat comparable to that analyzed in *United States v. Wallace*, 515 F.3d 327 (4th Cir. 2008). In *Wallace*, the defendant was tried and convicted of conspiracy to distribute controlled substances. Prior to trial, the parties agreed that a domestic violence incident would only be referred to as

> a domestic incident, a fight, or an argument because any further discussion would clearly be more prejudicial than probative. . . . Despite cautioning its witnesses not to discuss the incident, the following exchange took place between the Government and a police officer who was on the scene the night of the crime:
>
> > AUSA: And who did you — did you speak with anyone there?
> >
> > Officer: I did. I made contact with Tina Rodrigue. She advised me that she had been in a domestic scuffle with Mr. Wallace. He had choked her and slammed her into the side of the van—

---

[7] The jury's verdict does not itself establish that the jury ignored the curative instruction. *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 427 (4th Cir. 1996).

*Id.* at 330 (citations omitted).

The defendant's counsel immediately objected, and that objection was sustained. At the next break, the defendant's counsel asked the court to either provide a curative instruction or declare a mistrial. The court did not immediately grant or deny the motion, but provided a curative instruction as part of its final instructions. *Id.* at 330-31. The district court held that the curative instruction was enough to cure the prejudice, and the Fourth Circuit affirmed. *Id.* at 331.

As in *Wallace*, unfairly prejudicial information was presented to this jury, but a curative instruction was later given that negated the information's effect. As such, I decline to grant the defendants a new trial because Dr. Bailey's license suspension was revealed to the jury.

### C. Dr. Paschall's Testimony Regarding Mrs. McKee's Statements and Accompanying Medical Record.

At trial, the defendants sought to introduce evidence of statements that Mrs. McKee previously made to Dr. Paschall, the Idaho physician who treated Mr. McKee on June 25. On that date, Mrs. McKee relayed to Dr. Paschall what Dr. Bailey told Mr. McKee on June 7 — specifically that Dr. Bailey advised Mr. McKee to obtain a CT scan if he did not start to feel better. The plaintiff objected to Dr. Paschall testifying about this exchange because Dr. Paschall's testimony on the subject was inadmissible hearsay. *See* Fed. R. Evid. 802.

-30-

The defendants argued that this evidence was admissible under a number of theories. They argued that the statements were not hearsay because Mrs. McKee, as a statutory beneficiary, was a party opponent of the defendants. *See* Fed. R. Evid. 801(d)(2). They also argued that the statements were made for the purpose of medical diagnosis. *See* Fed. R. Evid. 803(4). I ultimately disagreed with the defendants' interpretation of these rules and held that the statements were hearsay.

I also redacted a short passage from a medical record from the hospital in Idaho where Mr. McKee passed away because that passage suggested that Mr. McKee was obligated to obtain a CT scan after his June 7 appointment with Dr. Bailey. The defendants were legally prohibited from making a contributory negligence or mitigation of damages argument,[8] so this passage was more unfairly prejudicial than probative because it suggested that Mr. McKee was himself at fault for failing to obtain a CT scan.

Both of these evidentiary rulings were appropriate. In any event, the fact that Dr. Bailey advised Mr. McKee to obtain a CT scan if he did not begin to feel better, the primary point of these communications, was later elicited through Dr. Bailey (Tr. 125-26, Dec. 4, 2015, ECF No. 125) and, to an extent, through Mrs.

---

[8] This subject is discussed more fully in Section E of this Opinion.

McKee.[9]  Accordingly, I do not believe that denial of this evidence necessitates a new trial.

### D. Introduction of Malpractice Insurance.

The defendants also challenge my decision to allow the introduction of evidence that Dr. Bailey had medical malpractice insurance through codefendant AEP.  The rules provide:

> Evidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully. But the court may admit this evidence for another purpose, such as proving a witness's bias or prejudice or proving agency, ownership, or control.

Fed. R. Evid. 411.

One of the issues in this case was whether Dr. Bailey was an employee or an independent contractor of AEP.  The plaintiff sought to introduce evidence of Dr. Bailey's medical malpractice insurance to support her position that Dr. Bailey was an employee of AEP.  Supplying of malpractice insurance is a relevant factor when assessing whether a doctor and hospital have an employment relationship.  *See Torres Vargas v. Santiago Cummings*, 149 F.3d 29, 32 (1st Cir. 1998) (holding that the existence of medical malpractice protection as one of five factors that influence whether a doctor and health care provider have an employee-employer

---

[9]  Mrs. McKee did not recall that Dr. Bailey had advised Mr. McKee to later obtain a CT scan, but she admitted that the medical records indicated that she had told Dr. Paschall that Dr. Bailey had so recommended.  (*Id*. at 92-93.)

-32-

relationship); *McGhee v. United States*, No. 7:13-CV-00123, 2014 WL 896748, at *3 (W.D. Va. Mar. 6, 2014) (noting that in typical employer-employee relationship, a hospital provides doctors with medical malpractice insurance). Because the insurance evidence was relevant to a material dispute, I allowed that evidence to be introduced. However, I instructed the jury that such evidence was not to be considered in any way when deciding the issue of liability, and that such evidence was only relevant to the issue of whether AEP had control over Dr. Bailey. (Jury Instr. No. 18, ECF No. 112.)

I find that the introduction of this evidence was appropriate in this case, and does not provide a sufficient basis for awarding a new trial.

### E. Mr. McKee's Duty to Arrange His Own CT Scan.

Prior to trial I directed that the defendants could not argue that Mr. McKee negligently contributed to his own death after being examined by Dr. Bailey. *Bagheri v. Bailey*, No. 1:14CV00077, 2015 WL 6824713, at *2 (W.D. Va. Nov. 6, 2015). This is because Virginia law makes clear that the defendants would only be able to establish a contributory negligence defense if Mr. McKee's alleged negligent was contemporaneous with Dr. Bailey's negligence. *See Chandler v. Graffeo*, 604 S.E.2d 1, 5 (Va. 2004). No such contemporaneous negligence was shown in this case.

-33-

In keeping with my ruling, I approved a jury instruction offered by the plaintiff that advised the jury that Mr. McKee was under no duty to arrange his own CT scan after visiting Dr. Bailey. (Jury Instr. No. 14A, ECF No. 112.) This instruction was necessary, at least in part, because the defendants introduced evidence showing that Dr. Bailey advised Mr. McKee to arrange for a CT scan if he did not begin to feel better.

The defendants argue that this instruction was unfairly prejudicial because it implied that as a matter of law there was a duty on Dr. Bailey's part to arrange a CT scan.

I disagree. Instead, the instruction was necessary to prevent the implication that Mr. McKee himself had a duty to arrange a CT scan. Accordingly, I believe the instruction was appropriate, and does not provide a basis for awarding a new trial.

### F.    Expert Economist Testimony.

The defendants argue that I should have excluded the testimony of Dr. Larry Lynch, the plaintiff's expert economist, because his testimony was partially based on Bureau of Labor data and national averages. The defendants made this argument in a pretrial motion in limine, which I denied in a previous opinion. *Bagheri*, 2015 WL 6824713, at *2-3. As I explained in that opinion, Dr. Lynch's analysis derived mostly from individualized factors that related to Mr. McKee. He

supplemented his analysis with generalized data when necessary. His analysis was admissible and assisted the trier of fact. As such, his testimony does not provide any basis for awarding a new trial.

## G. Subject-Matter Jurisdiction.

Lastly, the defendants argue that this court did not have subject-matter jurisdiction of this case because of a lack of diversity of citizenship, the defendants contending that Mr. McKee was a citizen of Virginia and not Idaho at the time of his death. This issue was the subject of a Motion to Dismiss filed prior to trial, and I held in a written opinion that diversity jurisdiction existed. *Bagheri v. Bailey*, No. 1:14CV00077, 2015 WL 6738306, at *4 (W.D. Va. Nov. 4, 2015). I continue to hold that view.

## III.

For the foregoing reasons, it is **ORDERED** that Defendant's Motion for a New Trial (ECF No. 132) is DENIED. Judgment will be entered forthwith.

ENTER: May 24, 2016

/s/ James P. Jones
United States District Judge

-35-